UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION


UNITED STATES OF AMERICA,          :       Docket No. 13-00294
                                   :
                   Plaintiff,      :
vs.                                :       July 10, 2015
                                   :
THOMAS DESSOYE,                    :
                                   :
                   Defendant.      :       Lafayette, Louisiana
_____


REPORTER'S OFFICIAL TRANSCRIPT OF THE SENTENCING HEARING
BEFORE THE HONORABLE ELIZABETH E. FOOTE
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:             JOHN LUKE WALKER
                               ROBERT CHASE ABENDROTH
                               United States Attorney's Office
                               800 Lafayette Street, Ste. 2200
                               Lafayette, LA  70501


FOR THE DEFENDANT:             WAYNE J. BLANCHARD
                               Federal Public Defender's Office
                               102 Versailles Blvd.
                               Lafayette, LA  70501




LARAE E. BOURQUE, RMR, CRR
Federal Official Court Reporter
800 Lafayette Street, Ste. 3103
Lafayette, LA  70501

```
 1                        P R O C E E D I N G S
 2              THE COURT:  All right.  The Court calls the case of
 3    United States of America vs. Thomas Dessoye, which is 13-294.
 4                 Representing the government we have Mr. Abendroth; is
 5    that correct?
 6                 MR. ABENDROTH:  That is correct, and Mr. Walker.
 7                 THE COURT:  And Mr. Walker.
 8                 All right.  And representing Mr. Dessoye, we have
 9    Mr. Wayne Blanchard.
10                 MR. BLANCHARD:  Good afternoon, Your Honor.
11                 THE COURT:  Good afternoon to you, sir.
12                 And, Mr. Dessoye, you are present in court?
13                 THE DEFENDANT:  Yes, ma'am.
14                 THE COURT:  Good afternoon to you.
15                 THE DEFENDANT:  Good afternoon.
16                 THE COURT:  You can be seated at this time.
17                 All right.  The Court notes that this sentencing is
18    pursuant to a plea to Count 4 of the superseding indictment,
19    distributing child pornography.
20                 Mr. Dessoye, have you had an opportunity to review the
21    presentence report that was provided by the probation office?
22                 THE DEFENDANT:  Yes, ma'am.
23                 THE COURT:  And you reviewed that with your attorney,
24    Mr. Blanchard?
25                 THE DEFENDANT:  Yes, ma'am.
```

```
 1              THE COURT:  All right.  And, Mr. Blanchard, you, of
 2    course, have reviewed this; is that correct?
 3              MR. BLANCHARD:  Yes, Your Honor.
 4              THE COURT:  The Court notes no objections to the
 5    presentence report, but certainly knows that you have filed a
 6    sentencing memorandum arguing that the Court should discount a
 7    number of the special offense characteristics that are added on
 8    to the base level offense based on the recommendations that are
 9    contained in the sentencing guidelines and other factors.  Is
10    that correct, sir?
11              MR. BLANCHARD:  Yes, Your Honor.
12              THE COURT:  All right.  But, Mr. Blanchard, let me go
13    over, then, how the calculation is made.
14              MR. BLANCHARD:  Okay.
15              THE COURT:  The base offense level was a 22 pursuant to
16    2G2.2(a)(2).  He received two additional points because the
17    material involved a prepubescent minor or a minor who's not
18    attained the age of 12.  He receives an additional six points
19    because it involved distribution to a minor that was intended to
20    persuade, induce, entice, or coerce the minor to engage in
21    illegal activity.
22              The Court wants to be very clear about the factual
23    basis underlying this specific offense characteristic.  This
24    relates to the distribution of child porn to the minor through
25    the Dropbox and the content of the text messages to the minor --
```

1    no.  It relates to the distribution of the child porn to the

2    minor through Dropbox.

3            The Court understands that the part of the indictment

4    dealing with text messages seeking to persuade the minor to

5    engage in sexual acts with another minor in Minnesota has been

6    dropped.

7            Is that all correct from the government's standpoint?

8            MR. ABENDROTH:  That is, Your Honor.

9            THE COURT:  Okay.  So the illegal activity is the

10   pornography?

11           MR. ABENDROTH:  Are you asking a question?

12           THE COURT:  I am.  The distribution of child

13   pornography to the minor through the Dropbox?

14           MR. ABENDROTH:  Through the Dropbox.  That is the

15   illegal activity.

16           THE COURT:  So the child then has possession?

17           MR. ABENDROTH:  Possession of child pornography.

18           THE COURT:  Okay.  There is an additional four points

19   because the material portrays sadistic or masochistic conduct or

20   other depictions involving violence.

21           There is an additional two points for the use of a

22   computer on an interactive computer service for the distribution

23   of the material.

24           There is an additional five points because the offense

25   involved 600 or more images.

1           And then he receives a minus three for acceptance of

2    responsibility meaning that there is a total offense level of 38.

3           Mr. Dessoye has no criminal history.  The guideline

4    range therefore falls to 235 to 293 months.  240 months is the

5    statutory maximum under 18 U.S.C. Section 2252(b)(1).

6           Does the government believe that the Court has

7    correctly calculated the guideline range?

8           MR. ABENDROTH:  We do, Your Honor.

9           THE COURT:  Mr. Blanchard?

10          MR. BLANCHARD:  Yes, Your Honor.

11          THE COURT:  All right.  At this time do we have a

12   victim impact statement?

13          MR. ABENDROTH:  We do, Your Honor.  Mr. Raymond Stawski

14   would like to make a statement to the Court, Your Honor.

15          THE COURT:  Please come forward, sir.  I think we have

16   Mr. and Mrs. Stawski here -- or, no, just Mr. Stawski.

17          MR. STAWSKI:  Your Honor, I'm going to try and get

18   through this as best I can.

19          THE COURT:  Yes, sir.  And we have all the time in the

20   world.

21          MR. STAWSKI:  Thank you.

22          I am writing this letter and presenting it to you,

23   Your Honor, in regards to the damage and pain that Thomas Dessoye

24   has caused our family and probably other families as well.

25          First of all, I do not want to be here.  The pain in

1    just recreating the last three years is as bad as it gets for

2    myself, my wife, and our children.  It has caused our family so

3    much strife and pain.  A letter of words will never fully

4    describe what we are going through.

5            First of all, I'd like to take the time to thank the

6    U.S. Attorney's Office, FBI, and county sheriffs for what they

7    have done.  They got our son back.  I also have to add

8    congratulations to them for building a rock solid case on all

9    charges.  I know the reason they accepted a plea bargain is

10   because they didn't wish to put our family through any more

11   punishment and stress than necessary as we did nothing wrong, and

12   they wanted to spare us flying down here and going through the

13   testimony process which would have been a final straw for us.

14           Their compassion was appreciated, and keeping our son's

15   psyche is the number one priority, but, Your Honor, he is an

16   emotional mess.  This has been devastating for our whole family,

17   which is painful for me to watch because my family is my world.

18   I hate to see them –– I hate to see them in such distress and

19   confusion.

20           Your Honor, I have a lot of faith in the justice system

21   and I know it does work and I hope it will again.  We have never

22   been involved in anything remotely close to a situation like

23   this.  Your Honor, I believe this man is a danger to society, and

24   I am confident your court will do whatever it must to protect our

25   vulnerable children.

1          Your Honor, we are a very vulnerable family as I am a

2     100 percent disabled veteran, and Thomas Dessoye knew this and

3     took advantage -- took full advantage and waited over eight

4     months until the time was right to pounce on my son like an

5     animal.  He started soliciting and grooming our son, acting as if

6     he was nearly the same age, through a chatline when our son was

7     only 15 years old.  He sent my son child pornography on my own

8     personal computer.  So I was in extreme danger of being accused

9     of criminal activity also, and there is more about this later.

10          Thomas Dessoye talked our son into opening and then

11     paid for a post office box to send my son money and drugs.  He

12     drove over 3,000 miles to pick our son up without any knowledge

13     or permission from my wife and I.  He drove him back to Louisiana

14     over a two-day period for the express purpose of child

15     exploitation.  I am told according to federal law that is

16     kidnapping by enticement and grooming.  He sent my son over 2,000

17     text messages.  With the lure of money and drugs, he coaxed our

18     son into sending him pictures.

19          He's guilty of receiving child pornography through the

20     internet, of soliciting and grooming a minor for sexual purposes,

21     of kidnapping and sexual misconduct with a minor.  I know all of

22     these carry heavy sentences.  And I'm sure there are other crimes

23     that I don't even know about, plus his previous criminal record

24     of crimes for which he has been convicted.  As citizens, we must

25     stress the lawmakers who make the laws and the justice system to

```
1    decide the penalties for breaking them.  I know you will seek
2    justice for our family.  Please imagine if you have children and
3    grandchildren how you would feel if this happened to you.  God
4    forbid it.  It easily can.
5           I asked our son just recently, while you're in school,
6    when you have a math problem or something and you get stressed
7    out, what is the first thing you think of, and he answered
8    Louisiana.  My first thought was, oh, my God, this is
9    posttraumatic stress disorder.  We both want to believe a child
10   will bounce back to a normal life, but I am not very optimistic
11   anymore.  He has now dropped out of school.  He has a very --
12           THE COURT:  I'm sorry.  He has dropped out of school?
13           MR. STAWSKI:  We took him out of school.  He couldn't
14   handle it.  He just couldn't handle school anymore.  He has a
15   very large scholarship that I'm afraid he will never use.  He has
16   a 50,000-dollar scholarship.
17           THE COURT:  To college?
18           MR. STAWSKI:  To college.
19           A counselor told me a person on average has about
20   60,000 thoughts a day.  If this occupies just one-tenth of
21   one percent of his mind, that's at least 60 times a day my son
22   could be thinking about this.  On most days I see the hurt in him
23   and I know it's there.
24           In my case, I think about this a whole lot more.  This
25   has consumed my mind for over two and a half years and this has
```

1    been ongoing for three years.

2         I'm trying to figure out how to ease his pain.  I see

3    him just walking around and he tells me he feels stupid and

4    worthless.  He tells me it's none of my business.  Your Honor, I

5    just cannot sit back and hope he grows out of it.  I can't.  I'm

6    doing everything I can.

7         He was a good kid and full of life and kindness until

8    Thomas Dessoye entered our lives.  I knew something was wrong

9    before Dessoye kidnapped him, but I just couldn't put my finger

10   on it.  Normally he would have come running to me with a problem

11   or a situation when he knew he was over his head, but how do you

12   approach your parents with something so awful?

13        I feel so guilty that I didn't spot the signs.  I was

14   not aware of how serious this situation was.  Just one solid clue

15   is all I would have needed to alert the authorities.

16        I also learned what normally happens is we, as parents,

17   find out, notify the police, and they take over until Dessoye

18   would have trapped himself.

19        There are many questions I was asking myself.  Where

20   was he getting the money?  Where were the drugs coming from?  Why

21   all of a sudden he becomes so secretive and combative?

22        My son hates me right now.  I haven't talked to him for

23   over six weeks.  He just will not talk to me.  He does not live

24   with me.  My son hates me because I wasn't able to see the clues

25   and protect him.  He won't take any advice from me even on the

1  simplest of things and that feels horrible.

2          Our son is on drugs now and totally out of control.  He

3  cannot concentrate.  His schooling and his priorities are all

4  messed up.  I know he's just trying to make sense of this, but he

5  just can't.  His mind just stopped growing when Dessoye entered

6  our life.  I know we need to get him into treatment, but he won't

7  go, and, Your Honor, we will continue to work on getting him the

8  help we need.

9          THE COURT:  Yes.  I was under the impression, sir, that

10  he was going to counseling at one point that was provided to him

11  by the state.  Is that not correct?

12          MR. STAWSKI:  He was going to counseling and the

13  counselor just didn't have the credentials for something so

14  heinous as this.  She just couldn't -- she didn't have the

15  credentials.

16          THE COURT:  Are there alternatives available to him?

17          MR. STAWSKI:  We are working with that through the

18  Minnesota Recreation Board (phonetic) to get him the help he

19  needs.  We're trying.

20          THE COURT:  Thank you, sir.  I interrupted you.  Please

21  continue.

22          MR. STAWSKI:  We're working on this as best we can.

23          It didn't surprise me to learn that I'm a victim also

24  in this case.  Child pornography was sent to my own personal

25  computer.  I had no idea that there was child pornography on it,

1  but it took the sheriff's office over ten days to tell me that I

2  had no involvement in this.  That was ten days of pure hell.

3  Thank God they did a thorough job, because if they would have

4  arrested me, I don't know what I would have done to myself.  I

5  honestly feared the worst if you know what I mean.  Do you

6  understand that point?

7  THE COURT:  Yes, sir.

8  MR. STAWSKI:  Just to be accused of something so

9  heinous is totally beyond my comprehension.  I just cannot wrap

10  my mind around it.  I am not sure, but I believe the

11  City of Big Lake was ready to arrest me on the spot.  Thank God

12  for Deputy Schuster (phonetic) who intervened.  He immediately

13  got it in the proper hands of a Detective Hanson (phonetic) and

14  Detective Ginetta (phonetic) and also Detective Escott when we

15  arrived in Louisiana.  I feared I was going to be arrested here

16  in Louisiana.

17  When my wife and I found out that our son was somewhere

18  in Louisiana, the sheriff's department needed a search warrant

19  for our house.  They couldn't get one until the next day, and I

20  said "F" that.  We would bring the computers in to them right

21  away.  But when my wife went to pick up the two computers -- pick

22  two of the computers up from the computer shop, she was

23  surrounded by four squad cars, and this is a gal who's never even

24  had a traffic ticket.  Can you imagine how that made her feel?

25  And to have six or seven squad cars come rolling into our

1    driveway?  The terror of that day I will never forget.

2         There were so many questions that we had no answers to.

3    The sheriff's department didn't have to do anything.  We tore our

4    own house upside down looking for any computer-related item that

5    we could find for the sheriff's department to take because we

6    still didn't know what was going on.

7         Your Honor, with all the phone calls coming in and

8    confusion, there were times that I thought Dessoye had killed my

9    son.  We were so desperately relieved when we knew for sure he

10   was in the sheriff's hands in Louisiana.

11        My wife and I are separated now and have entered

12   divorce proceedings.  We have been together for 30 years.  We

13   just can't come to any agreements anymore.  We just can't.  We

14   just can't come to any agreements.  A lady from the victim's

15   recreation board told us when we got back home that this might

16   very well happen.  We were counseled very heavily when we got

17   home on what to expect and what to try and do and not to do.

18        We lost our home to foreclosure.

19        I would like you to see this house.

20        THE COURT:  Yes, sir.

21        MR. STAWSKI:  I built that house brick by brick by

22   myself.  This will give you an idea of the permanent damage that

23   Dessoye has caused us.

24        I know I should have seen the warning signs and I

25   believe our son wanted to tell us, but he was just too scared.

1              Your Honor, I've learned a lot about grooming over the

2    last two and a half years.  Did Dessoye have a manual for this?

3    Because I've read everything off the U.S. Attorney's website and

4    he was perfect.  He did not miss a beat and waited in the weeds

5    for the right time when we were really struggling and he pounced.

6     There's no excuse for what he did, and he knew exactly what he

7    was doing.  I knew something was wrong, but I didn't know what it

8    was or what to do, and what is so sad, Your Honor, is I know now,

9    but I'm too late.

10             I tried to hire a lawyer.  He wanted a 15,000-dollar

11   retainer before he would even talk to me.

12             I then went to the sheriff's office and told

13   Detective Tim Ginetta and Detective Ken Hanson that I have to put

14   my faith in God and you guys to help us through this.  I was so

15   helpless, scared, confused, and I still am confused.

16             And, Your Honor, may I say something to Dessoye?

17             I'll direct it to you.

18             THE COURT:  Direct the remarks to the Court, sir, yes.

19             MR. STAWSKI:  And to Dessoye, I say you must come clean

20   with the Lord, and the only way you can is to come clean with the

21   U.S. Attorney's Office.  You need to tell them everything you

22   know in detail, who you have hurt, who you have sent files to,

23   anything and everything.  No detail is too small.  That is the

24   only gateway to redemption.

25             I did come bearing one gift for him and that is a

```
 1   Bible.
 2              MR. ABENDROTH:  May I give that to Mr. Blanchard?
 3              THE COURT:  To Mr. Blanchard, yes.
 4              MR. STAWSKI:  In closing, Your Honor, thank you for
 5   your time and all the people who worked so diligently to bring
 6   this man to justice and start some type of closure for our family
 7   so we can start the healing process.  I hope we can be assured he
 8   will never do this again.
 9              A special thanks goes out to Robert Abendroth and
10   Detective Escott for helping us through this extremely tough
11   time.  He allowed us to lean on him when he knew we were hurting
12   the most, and I know he felt our pain.
13              And I have one -- this was written six weeks ago about,
14   and this is just a little update of what's going on.  I already
15   mentioned it.  D.S. has a scholarship for $50,000, which I'm
16   afraid he's not going to use.  That's a lot of money.  So that's
17   a good education.
18              When Dessoye entered our lives, this poor kid never had
19   a chance, he never had a chance, and that's what makes me so
20   angry and sad.  If I would have just seen one clue.
21              And D.S. now has -- my son, D.S., now has pending
22   felony charges for drug possession and we're dealing with that as
23   best we can.
24              THE COURT:  Were those arising out of this matter or
25   are there subsequent problems?
```

```
 1                    MR. STAWSKI:  Yes.

 2                    THE COURT:  They're new problems?

 3                    MR. STAWSKI:  They're new problems.  He's had a lot of

 4      problems since this all started.  He just -- can I tell you a

 5      little quick story?

 6                    THE COURT:  Certainly, sir.

 7                    MR. STAWSKI:  I remember one day he was about 14 years

 8      old and he had ten pieces of candy, let's say, and there were ten

 9      kids.  He passed out all ten pieces of candy and realized there

10      wasn't one for him.  He took that last piece of candy and gave it

11      to the other kid and left himself without one.  That's the kind

12      of kid he was.

13                    And everything is so F'd up now that it's just beyond

14      my comprehension.  I mean, he's just changed.  He's combative.

15      He's just -- he's just -- I don't even recognize the kid.  And

16      this was a good kid.  And they know it in Minnesota.  There's

17      lots of people trying to help him.  He just -- he just can't

18      comprehend it.  He just -- his mind stopped growing.  He just --

19                    THE COURT:  Sir, you are obviously in a lot of pain

20      yourself.  Do you have some resources to help you in terms of

21      dealing with this?

22                    MR. STAWSKI:  I am guided.  I'm a 100 percent disabled

23      vet.  I have a care coordinator.  I have a team.

24                    THE COURT:  That helps you?

25                    MR. STAWSKI:  That helps me, yes.
```

1          THE COURT:  All right.  Sir, I know that you have also

2    filed a claim, is that correct, a monetary claim?

3          MR. STAWSKI:  Yes.

4          THE COURT:  All right.  The Court would need you to put

5    on evidence with regard to that claim if you are finished with

6    your victim impact statement at this time.

7          Mr. Abendroth, the Court would require that he would be

8    sworn and put forth some evidence.

9          MR. ABENDROTH:  Your Honor, I spoke to Mr. Blanchard

10   prior.  I don't believe that there is an objection to the amount.

11          THE COURT:  Okay.  And that amount is what?  Let's

12   state it for the record.

13          MR. BLANCHARD:  I don't remember the exact amount,

14   Your Honor, but he's correct.  We spoke about it.

15          MR. ABENDROTH:  It was -- I believe it was $5,500

16   approximately.

17          THE COURT:  $5,950 -- oh, I'm sorry.  $5,095.

18          MR. ABENDROTH:  Yes, Your Honor.

19          THE COURT:  Pursuant, then, to that stipulation, the

20   Court would not need the testimony on that issue.

21          All right.  Sir, do you understand what we just did?

22          I was asking for your testimony as to the amount of

23   your loss in order that I could make that part of the sentence,

24   but the attorneys have agreed to it, and so mandatory restitution

25   in that amount will be part of his sentence.  I cannot comment on

1  what your chances would be about recovering that money, but that

2  is the -- the Court would make that part of the sentence.

3          Is there anything else, sir, that you wish for the

4  Court to consider before we go forward in these proceedings

5  today?

6          The Court certainly takes your remarks seriously, sir,

7  and will take those into consideration.

8          MR. STAWSKI:  I guess one thing I'd have to add is how

9  the Court had me fill out the $5,000.  I added it up.  It's

10  anywhere from $300,000 to $500,000.

11          THE COURT:  I can imagine that, sir.  I can imagine

12  that there's no way -- you know, when you consider things like

13  you were mentioning like the lost scholarship, the possibilities,

14  et cetera, but this Court is now limited by what you did fill out

15  to that amount.

16          MR. STAWSKI:  Yes, I understand.

17          THE COURT:  All right.

18          MR. STAWSKI:  Am I excused?

19          THE COURT:  Yes, sir, you are excused -- not that

20  you're excused.  You came here voluntarily to make your

21  statement.  So you were never under any court constraint if I

22  could put it that way.

23          MR. STAWSKI:  Thank you.

24          THE COURT:  Thank you, sir.

25          All right.  At this time, then, the Court would ask

```
 1    Mr. Blanchard and Mr. Dessoye to come forward.

 2              MR. BLANCHARD:  Yes, Your Honor.

 3              THE COURT:  Mr. Blanchard, do either you or Mr. Dessoye

 4    have anything that you -- any statements you would like to make

 5    to the Court?

 6              The Court certainly invites you, and in particular

 7    Mr. Dessoye, to make any statement to the Court.

 8              MR. BLANCHARD:  I do, Your Honor.

 9              First, I'm so sorry, Mr. Stawski, about what happened

10    to your family.  Having two sons who were once teenagers

11    themselves and knowing how they felt about things and sometimes

12    me then and how they feel now after they've matured a little bit,

13    I hope that, you know, you and your son heal your wounds.  I

14    think that often happens as kids mature.

15              You know, what Mr. Dessoye did was inexcusable.  That's

16    why Mr. Dessoye pled guilty here, Your Honor.  He knows it was

17    inexcusable.  And I know that certainly this caused some pain to

18    the young man and to the family, but I think the text messages

19    showed that the young man had some problems before then also,

20    Your Honor.  Did Mr. Dessoye take advantage of him?  Yes, he did.

21    And, again, he's tried to do what he can by coming here and

22    pleading guilty, Your Honor.

23              I'd just ask you to take my sentencing memorandum into

24    account.  Some of these specific offense characteristics occur so

25    often that they -- I mean, I think it diminishes their
```

1   meaningfulness, Your Honor.  I think what isn't diminished and

2   what we certainly don't dispute at all is the six levels for him

3   having distributed this material to a minor.  I think that more

4   than takes into account the fact that he distributed it to a

5   minor, and it is meaningful considering that that only implies a

6   half percent of the time.

7          And the other thing I would say about these guidelines,

8   Your Honor, is I think when they were drafted, people were not

9   obtaining this illegal material by file sharing programs as

10   often.  That bumps all of these numbers up.  The number of

11   images, it's going to be bumped by file sharing.  The fact that

12   some of this may depict prepubescent minors is going to be bumped

13   by file sharing.  It's going to give you indiscriminate results,

14   and it's going to result in getting both prepubescent and

15   postpubescent child pornography, Your Honor.  I would ask you to

16   take all of that into account in sentencing Mr. Dessoye.

17          And Mr. Dessoye has something that he wants to say to

18   Your Honor.

19          THE COURT:  Thank you, Mr. Blanchard, for those

20   thoughtful comments.

21          THE DEFENDANT:  Your Honor, D.S., Mr. and Mrs. Stawski

22   and your entire family, my deepest and most humblest apologies

23   for the pain that I've caused you.  I know that mere words can

24   never repair or replace what I've taken from you.  I want you to

25   know there is not a day or a night that goes by that I don't pray

1    for healing and your compassion to forgive me for the pain that

2    I've caused you.  I can't begin to tell you how pained and

3    embarrassed and humiliated I am for my actions.

4            I'm sure you can't think that I can imagine the impact

5    that I've had on your family, but I know all too well because

6    through my actions I've crushed the hearts of people –– the three

7    people that I love most in my life and that's my children.  I

8    also pray every day and night that they'll find the compassion to

9    forgive me as well.

10           I can't describe how it feels knowing how it feels

11   going from being their hero, their provider, their protector, to

12   someone who has let them down beyond any stretch of the

13   imagination.  I can only tell you that it feels horrible, empty,

14   and it's a pain in every waking moment.

15           I want you to know despite the circumstances, I am not

16   a horrible person.  For the past 20 years I've been a loving,

17   caring father, and spouse.  I was considered a pillar in my

18   community and my church.  I was looked upon with great respect.

19   But through this I was cursed with a dark secret, a sickness, a

20   disease, an addiction, if you will, that I was too proud, too

21   ashamed, or too scared to seek help for.  I say an addiction.

22   Just like drugs or alcohol, I was addicted to pornographic

23   material, and even more than viewing it, I was getting it and

24   sending it.

25           Your Honor, I have pled guilty to these charges and I

1   take full responsibility for the shameful acts that I have

2   committed.  I realize that I need punishment through

3   incarceration for the wrongs that I've committed.  I also beg the

4   Court to show me leniency in my sentencing.  I also beg the Court

5   to please consider some sort of long-term treatment program as

6   part of my sentence to help me address my problems, not just

7   locking them up through incarceration.

8           Your Honor, again, I take full responsibility for the

9   distribution of child pornography and distribution of it to a

10  minor.  I couldn't be more remorseful or ashamed of what I've

11  done to the Stawski family unit, my children, my family, my

12  friends, and all my loved ones.

13          I beg Your Honor to show me leniency in my sentencing.

14  I would ask that in sentencing, Your Honor would consider my age,

15  and that it could be a sentence that could get me out in time

16  that I would still be fruitful and could make restitution to the

17  Stawski family for the costs that they've incurred or will incur

18  in the future.

19          I would like to thank you, Your Honor, for affording me

20  this time.

21          Once again, I would like to offer my deepest apologies

22  to D.S. and his family.  Thank you for the Bible.  It may please

23  you to know that I've already found God and I'm sorry.

24          That's it, Your Honor.

25          THE COURT:  Thank you, sir.

1          Mr. Blanchard, anything further?

2          MR. BLANCHARD:  No, Your Honor.

3          THE COURT:  The Court thanks you, Mr. Dessoye, for your

4    comments.  The Court would address the defendant's concerns about

5    the specific offense characteristics that have been applied in

6    this case.  This Court itself has frequently criticized an

7    arbitrary application of the specific offense characteristics

8    that go along with either the distribution or possession of child

9    porn.  Indeed, that criticism itself is borne out by the

10   Sentencing Guideline Commission which issued a report on this

11   very issue.  If fact, it's a whole publication.

12          The thrust of that argument by the Sentencing

13   Commission is that we need to re-examine the automatic or

14   arbitrary application of those specific offense characteristics

15   because the sentencing guidelines tend to focus on collecting

16   behavior -- they should focus on the collecting behavior as

17   opposed to the nature of the collection.

18          The Guideline Commission has criticized the arbitrary

19   application of those sentencing characteristics where the nature

20   of the collection is what controls the sentence as opposed to the

21   defendant's own collecting behavior.

22          In this specific case, however, this Court finds as a

23   matter of fact that the application of these particular specific

24   offense characteristics are related to the collecting behavior of

25   this defendant and of the relevant conduct that led to the

1    commission of this crime for which he has pled guilty.

2           For example, the use of a computer, the additional two

3    points under Section 2G2.2(b)(6), is routinely thrown out by this

4    Court in cases where there is a simple possession charge of

5    pornography in that, as Mr. Blanchard points out, the use of the

6    computer is in modern days the way that people possess porn or

7    they distribute it on an automatic file sharing program.

8    However, that's not the facts in this case.

9           In this case, in particular, we know that the use of

10   the computer was extensive.  It was used as a method -- the text

11   messages were used as a method of grooming this minor child for

12   receipt of the pornography.  It was used to entice the minor

13   child to do this.  The minor was instructed and enticed to use

14   Dropbox.  The text messages revealed that the minor even resisted

15   viewing the pornography at first which had been placed in the

16   Dropbox until that minor was pressured via the text messages, via

17   the use of a computer, to look at what was placed in the Dropbox.

18   Thus, the computer became the method of seduction, it became the

19   method of grooming, and this Court therefore believes that that

20   two-point enhancement in this case goes beyond arbitrary

21   application.

22          Likewise, the Court routinely throws out the

23   enhancement under 2G2.2(7)(D), an additional five points because

24   the offense involved 600 or more images.  The reason the Court

25   would do this on some occasions is because a person who is in

1    possession of child pornography may be participating in a file

2    sharing program where the number of the images comes to them and

3    that video images are also included.

4            However, in this case there is specific -- this is not

5    an arbitrary application because of the collecting behavior of

6    this defendant and the distribution behavior.  There is a

7    particular reference in the text messages that this defendant

8    reached a level with the minor where the minor was in the, quote,

9    100 club where that minor had received over 100 images.  Thus,

10   the number of images that the defendant possessed becomes

11   relevant to his distribution to the minor that he did perform.

12           It is for those reasons that the Court is disinclined

13   at this time to take off the specific offense characteristics.

14           The Court has looked at other factors in determining

15   the form of the sentence.  The Court notes that in mitigation for

16   Mr. Dessoye, that Mr. Dessoye himself was sexually abused as a

17   child.  He has a criminal history category of one.  That

18   Mr. Dessoye -- so that we know of no other -- no other issues

19   that he has had.  We know that he has lost a good job as a result

20   of all of this as well, but those mitigating circumstances are

21   not enough to dissuade this Court from giving a guideline

22   sentence in this matter.

23           Mr. Dessoye, it is for those reasons that the Court has

24   enunciated that you are committed to the Bureau of Prisons for a

25   term of 240 months.

1        Upon release from imprisonment, you are placed on

2   supervised release for a term of ten years.

3        The 100-dollar mandatory special assessment is imposed

4   pursuant to 18, U.S.C., Section 3013.  If it is not paid, it is

5   due immediately.

6        Mr. Dessoye, you are also ordered to make mandatory

7   restitution in the amount of $5,095 to Raymond and Tammy Stawski

8   through the Clerk of Court's office.  Restitution is due and

9   owing immediately.  Any interest requirement is waived.

10       No fine is ordered in light of the defendant's

11  inability to pay a fine, the mandatory restitution, and the

12  length of the prison sentence which the Court has imposed.

13       When you do get out of prison, Mr. Dessoye, within 72

14  hours of release you will report in person to the probation

15  office in the district to which you are released.

16       While on supervised release, you will abide by the

17  standard conditions of supervision and the following special

18  conditions:  You will not commit another state, federal, or local

19  crime.  You will not possess a firearm.  You will not unlawfully

20  possess a controlled substance.  You will cooperate in the

21  collection of DNA.  You will report the address where you reside

22  and any subsequent change of address to the probation officer

23  responsible for your supervision.  And you will register as a sex

24  offender in any state in which you reside, are employed, carry on

25  a vocation, or are a student.  You shall submit to one drug test

1    within 15 days of placement on supervised release and at least

2    two periodic drug tests thereafter as directed by the

3    United States Probation Office.

4             While on probation and under the guidance and direction

5    of the U.S. Probation Office, you will participate in a sex

6    offender treatment program which may include the application of

7    psychological testing until you are discharged from supervised

8    release.  If I said "while you were on probation," that was a

9    misspeak.  It would in fact be while you are on supervised

10   release.  I did.  I said "while on probation and under the

11   guidance and direction of the U.S. Probation Office," and that is

12   an incorrect statement.  It would be while on supervised release,

13   and the Court corrects that statement.

14            The defendant shall obtain the permission of the

15   probation office before he subscribes to the uses of the

16   internet.

17            In accordance with the recent jurisprudence, any

18   employment that the defendant would have which would require use

19   of a computer, he would need the approval of the probation office

20   to in fact use that computer.

21            The defendant shall not associate with any minor under

22   the age of 18 unless the minor's parent or legal guardian is

23   present except for those minors that he would come in contact

24   with in a casual manner in any public situation.

25            The defendant shall not possess or use any form of

1    pornography and shall not enter any location where pornography

2    can be obtained or viewed.

3            The defendant shall submit to polygraph testing as

4    directed by the probation office.  The defendant is directed to

5    pay any costs of this testing as his financial ability is

6    determined by the probation office.

7            The defendant shall pay any outstanding balance owed

8    towards restitution in monthly installments of at least $100 to

9    begin 30 days after commencement of supervised release.  The

10   defendant shall provide full financial disclosure to the

11   probation office and shall not obtain new lines of credit while

12   there is a balance owed towards the restitution.

13           The Court would recommend to the Bureau of Prisons that

14   the defendant would be placed in a facility which would be

15   appropriate for sex offenders and that he would receive treatment

16   as he has requested.

17           Mr. Blanchard, anything else I should add to that?

18           MR. BLANCHARD:  No, Your Honor.

19           THE COURT:  All right.  From the government, is there

20   anything else?

21           MR. ABENDROTH:  Your Honor, the government would move

22   to dismiss Counts 1, 2, 3, and 5 of the superseding indictment.

23           THE COURT:  Those counts are dismissed.

24           Mr. Abendroth, we have not dismissed charges on anyone

25   else today.

1          MR. WALKER:  We don't have to.  They all pled to

2    Bills of Information.  There were no charges to dismiss.

3          THE COURT:  Oh, very good, very good.  All right.

4          MR. WALKER:  Your Honor, you recommended sex offender

5    treatment.  I know within the Bureau of Prisons, if you'll

6    recommend Devens, Massachusetts, that's kind of their central

7    point where all sex offenders go and then they send them to

8    facilities after that.

9          THE COURT:  The Court would recommend to the Bureau of

10   Prisons for placement in Devens, Massachusetts.  But wait.  We're

11   not quite finished here.

12         Mr. Smith, can you come forward.

13                    (Conferring)

14         THE COURT:  The Court has concerns about the

15   restrictions of computer use during supervised release in

16   accordance with recent jurisprudence.  The Court believes that

17   the way that it has described the limit on internet use, as well

18   as the access to minors, is in compliance with the current

19   jurisprudence.

20         Any comment, Mr. Walker?  You rise.

21         MR. WALKER:  Your Honor, in fact, I believe it is in

22   compliance with current jurisprudence.  If you had said he has no

23   access to the internet, I think that would be a problem, but

24   you've said that it's simply supervised by probation.  He has to

25   get their permission.

1          THE COURT:  And the same thing with regard to contact

2     with the minors.  You can't forbid contact in public which is not

3     sought out, but which is just part of walking down the street.

4          All right.  Mr. Blanchard?

5          MR. BLANCHARD:  I would object to the entirety of the

6     sentence under all of the facts and circumstances of the case,

7     but as to computer use, I thought that when you addressed

8     employment, that you said he couldn't use a computer at all.

9          THE COURT:  No, no.  He just needs permission from the

10    probation office in connection with any employment.  So, in other

11    words, if he was working somewhere where he needed to use the

12    computer, the probation office would ascertain what the limits of

13    that computer use was and is.  If it's at an adult bookstore,

14    perhaps that would not be a computer use that the probation

15    office would allow, but if it was something else, then they would

16    allow it.

17         MR. BLANCHARD:  Yes, Your Honor.

18         THE COURT:  All right.  Mr. Dessoye, the Court never

19    sentences anyone without a heavy heart.  In this case the Court

20    has simply done its best with the facts that are before it.

21         Mr. Blanchard, we thank you so much for representing

22    Mr. Dessoye.

23         Mr. Dessoye, you are remanded to the custody of the

24    Federal Bureau of Prisons for the commencement of your service.

25         You do have a right to appeal this sentence, and if you

1   do appeal it, then your presentence report and the sentencing

2   memorandum will be sent under seal to the Court of Appeal, and

3   Mr. Blanchard or someone in the Federal Public Defender's Office

4   will be appointed to represent you in connection with that

5   appeal.  Do you understand?

6            THE DEFENDANT:  Yes, ma'am.

7            THE COURT:  All right.  Thank you.  This matter is

8   completed.

9                      (Proceedings adjourned.)

10                       _   _   _

11

12                      Certificate

13   I hereby certify this 2nd day of September, 2015, that the

14   foregoing is, to the best of my ability and understanding, a true

15   and correct transcript from the record of proceedings in the

16   above-entitled matter.

17

18                       */s/ LaRae E. Bourque*

19                       Federal Official Court Reporter

20

21

22

23

24

25